## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MILLICENT PLATT, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FIREMAN'S FUND INSURANCE COMPANY, | : | NO.  11-4067 |
| | : | |
| Defendant. | : | |

### MEMORANDUM

BUCKWALTER, S.J.                                                    May 22, 2012

Currently pending before the Court is the Motion for Partial Summary Judgment filed by

Defendant Fireman's Fund Insurance Company.  For the following reasons, the Motion is granted

in part and denied in part as set forth in the accompanying Order.

## I.      INTRODUCTION

On December 23, 2008, Plaintiff Millicent Platt was struck by a vehicle driven by Dr.

Richard Ellis, who was insured by Defendant Fireman's Fund Insurance Company.  (Def.'s Mot.

Summ. J., Ex. A-1, Dep. of Millicent Platt ("Platt Dep."), 12:12-15, Feb. 9, 2012; Pl.'s Resp.

Opp'n, Ex. D, Fireman's Fund Claim History Caption Report ("Claim Report") at FFIC 00091-

92.)  As a result of the accident, Plaintiff sustained several injuries, including a fractured tibia

and a partial tear of a ligament in her left leg.  (Claim Report at FFIC 00090.)  She was also

unable to return to her job as an underwriting assistant at the Philadelphia Insurance Company.

(Platt Dep. 10:6-14, 12:6-11.)

On December 24, 2008, Defendant opened a third-party bodily injury file in connection

with Plaintiff's claim against Dr. Ellis.  (Claim Report at FFIC 00092.)  Subsequently, on

February 16, 2010, Defendant also opened a claim under the First Party Benefits endorsement of Dr. Ellis's insurance policy.  (Id. at FFIC 00086.)  These benefits are referred to as Personal Injury Protection ("PIP").  (Pl.'s Resp. Opp'n, Ex. G, Dep. of Julie Franklin ("Franklin Dep."), 13:13-20, Feb. 29, 2012.)  PIP provides a maximum amount of $177,500 for first party benefits coverage, and includes medical benefits and wage loss.  (Def.'s Mot. Partial Summ. J., Ex. B-1, Automobile Insurance Policy Issued to Dr. Richard A. Ellis ("Policy") at FFIC 00006.)  After receiving Plaintiff's PIP Application and Affidavit of No Insurance on March 23, 2010, Defendant began to process Plaintiff's medical benefits, ultimately paying out $53,521.73.  (Def.'s Mot. Summ. J., Ex. B, Decl. of Amy Brott ("Brott Decl.") ¶¶ 10-12.)

Plaintiff also sought wage loss benefits under the PIP policy, which required her to submit to Defendant wage verification from her employer as well as medical proof of her disability.  (Id. ¶¶ 13-15.)  After reviewing two medical reports, Defendant "determined that while [Plaintiff] was disabled for certain periods of time after the accident and her various surgeries, she was able to work a sedentary job at other times, so long as she was able to commute to work without having to walk any significant distance."  (Id. ¶ 18.)  In accordance with these findings, Defendant issued a $34,581.02 check to Plaintiff on June 1, 2011.  (Id. ¶ 19.)  Defendant admits that when calculating the wage loss, it mistakenly excluded the time Plaintiff received short term disability benefits, which resulted in an improper deduction of $3,716.66 from the payment.  (Id. ¶ 20.)  Plaintiff disagreed with the amount Defendant paid her, and returned the check after marking it "VOID."  (Id. ¶ 22.)

On August 24, 2011, Defendant received a supplemental report that stated Plaintiff was unable to do even sedentary work.  (Id. ¶¶ 23-24.)  Based on this new information, Defendant

determined that Plaintiff was unable to work from the date of the accident onward.  (Id. ¶ 25.)
Accordingly, on September 19, 2011, Defendant issued Plaintiff a check in the amount of
$113,438.70, and made regular monthly wage payments until the entire $177,500 limit of the PIP
policy was exhausted on December 20, 2011.  (Id. ¶¶ 26-27.)

On May 25, 2011, Plaintiff filed her Complaint in the Philadelphia Court of Common
Pleas.  The Complaint alleged that Defendant breached the insurance contract by: (1) not paying
Plaintiff in accordance with the terms of the policy and with 75 Pa. C.S. § 1712 et seq.; (2)
failing to timely investigate and make payment in the absence of an investigation; (3) failing to
exercise good faith and breaching fiduciary duties; and (4) failing to reimburse Plaintiff for
expenses she incurred in connection with her medical care, including transportation costs.
(Compl. ¶¶ 28-31.)  The Complaint further alleged that Defendant acted in bad faith by: (1)
failing to act promptly on Plaintiff and her counsel's communications; (2) failing to implement
reasonable standards for prompt investigations of claims; (3) refusing to pay Plaintiff's claims
without conducting a reasonable investigation; (4) failing to effectuate a prompt and equitable
settlement of Plaintiff's claims; (5) failing to provide a reasonable explanation for refusing to pay
money owed to Plaintiff; (6) misrepresenting pertinent facts related to insurance coverage; (7)
failing to act promptly upon receipt of communications related to Plaintiff's claims; and (8)
failing to provide a reasonable explanation for denying Plaintiff's claims.  (Id. ¶ 38.)  Plaintiff
sought compensatory damages, as well as attorney's fees, costs, and punitive damages pursuant
to 42 Pa. C.S. § 8371.

Defendant successfully removed the action to this Court on June 22, 2011, and filed the

present Motion for Partial Summary Judgment on March 23, 2012.[1]  Plaintiff filed her Response in Opposition on April 6, 2012, and Defendant filed a Reply Brief on April 13, 2012, making the Motion ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine

---

[1]  Defendant, acknowledging a factual dispute concerning Plaintiff's entitlement to statutory interest, has only moved for partial summary judgment.  (Def.'s Mem. Supp. Mot. Partial Summ. J. ("Def.'s Mem.") 11.)

issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.  Summary judgment may be granted when "the evidence is merely colorable . . . or is not significantly probative." Id. at 249-50 (citations omitted).

## III.   DISCUSSION

Defendant moves for summary judgment on Plaintiff's bad faith and breach of contract claims, as well as her request for attorney's fees.  The Court considers each issue in turn.

### A.   Bad Faith

#### 1.   Whether Defendant Acted in Bad Faith by Delaying its Investigation into Plaintiff's Source of First Party Benefits

Pennsylvania provides a statutory remedy when an insurer acts in bad faith towards its insured.  See 42 Pa. C.S. § 8371.[2]  This statute "is not restricted to an insurer's bad faith in

---

[2]  The statute states in its entirety:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

5

denying a claim.  An action for bad faith may also extend to the insurer's investigative practices."
O'Donnell ex rel. Mitro v. Allstate Ins. Co., 734 A.2d 901, 906 (Pa. Super. Ct. 1999).  When
making a bad faith claim based on an insurance company's delay, the plaintiff must establish
"that 'the delay is attributable to the defendant, that the defendant had no reasonable basis for the
actions it undertook which resulted in the delay, and that the defendant knew or recklessly
disregarded the fact that it had no reasonable basis to deny payment.'"  Thomer v. Allstate Ins.
Co., 790 F. Supp. 2d 360, 370 (E.D. Pa. May 9, 2011) (quoting Wiedinmyer v. Harleysville Mut.
Ins. Co., 42 Pa. D. & C.4th 204, 216 (1999)).  In conducting this analysis, it is important to
emphasize that "[m]erely negligent conduct, however harmful to the interests of the insured, is
recognized by Pennsylvania courts to be categorically below the threshold required for a showing
of bad faith."  Greene v. United Servs. Auto. Ass'n,  936 A.2d 1178, 1189 (Pa. Super. Ct. 2007).
Finally, "bad faith must be proven by clear and convincing evidence and not merely insinuated."
Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (citations
omitted).

 Before addressing Plaintiff's bad faith claim, it is important to define both the type and
the terms of the insurance coverage at issue in this case.  Under the general provisions of Dr.
Ellis's policy, Plaintiff was not covered as "an insured."  (See Policy at FFIC 00020, 00022
(defining who qualifies as an insured).)  The policy did, however, cover damages for which an
insured is legally responsible, meaning Defendant could potentially be liable to Plaintiff for
injuries caused by Dr. Ellis.  (Id. at FFIC 00019.)  Therefore, when Defendant first became aware

---

 (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. § 8371.

of the accident involving Dr. Ellis and Plaintiff, it assigned Plaintiff's claim to a bodily injury claims adjuster.  (Brott Decl. ¶¶ 5-6.)

There is also, however, a separate endorsement to the policy, entitled "First Party Benefits Coverage," which provides benefits for medical expenses and "work loss."  (Policy at FFIC 00036.)  Under this section, the definition of insured includes any person "[n]ot occupying a motor vehicle if injured as a result of an accident in Pennsylvania involving [the policy holder's] covered auto."  (Id. at FFIC 00037.)  These first party benefits, also known as PIP benefits, are paid in accordance with a specified set of priorities, explained as follows:

> We will not pay if there is another insurer at a higher level of priority.  The First category listed below is the highest level of priority and the Fourth category is the lowest level of priority.  The priority order is:
>
> First:     The insurer providing benefits to the insured as a named insured.
> Second:  The insurer providing benefits to the insured as a family member who is not a named insured under another policy providing coverage under the [Pennsylvania Motor Vehicle Financial Responsibility Law].
> Third:    The insurer of the motor vehicle which the insured is occupying at the time of the accident.
> Fourth:  The insurer of any motor vehicle involved in the accident if the insured is not:
> a. Occupying a motor vehicle; and
> b. Provided first party benefits under any other automobile policy.

(Id. at 00039-40.)  In short, whether Plaintiff qualified as "an insured" for purposes of receiving First Party Benefits was contingent upon whether she had a separate source of insurance.  If she did not have any other form coverage, she could file a claim for PIP benefits with Defendant.

Here, Plaintiff alleges that Defendant acted in bad faith by failing to conduct a reasonable investigation into her claim.  (Compl. ¶ 38.)  More specifically, Plaintiff asserts that Defendant had a duty to provide her with information regarding all forms of coverage that could potentially be available to her.  (Pl.'s Resp. Opp'n 20-21.)  To that end, Defendant should have notified

Plaintiff about her possible eligibility for PIP benefits at the time she made her initial claim for third-party benefits against Dr. Ellis in December 2008.  (Id.)  Without providing a reasonable explanation, Defendant failed to promptly investigate and discover that Plaintiff lacked a separate source of First Party Benefits.  (Id. at 19.)  As a result, Defendant did not open her PIP file until February 16, 2010—420 days after Defendant first became aware of the accident.  (Id.)  Plaintiff alleges that this delay amounts to bad faith.

In its Motion for Summary Judgment, Defendant makes two arguments with respect to this cause of action.  First, Defendant contends that Plaintiff lacks standing to bring a bad faith claim against the bodily injury adjusters for their alleged failure to investigate whether Plaintiff was entitled to PIP benefits.  (Def.'s Mem. 17-18.)  Second, Defendant asserts that even if Plaintiff has standing, she has not produced clear and convincing evidence of bad faith.  (Id. at 18-20.)  The Court first addresses the standing issue.

Defendant notes that Pennsylvania's bad faith statute only authorizes actions for "'bad faith toward the insured,'" and argues that anyone who does not qualify as an insured lacks standing to sue under the law.  (Def.'s Mem. 17 (quoting 42 Pa. Cons. Stat. § 8371).)  As discussed above, Plaintiff is only considered an insured for purposes of First Party Benefits, and does not qualify under Dr. Ellis's policy generally.  Accordingly, Defendant contends that "[t]o the extent Plaintiff argues that the bodily injury adjusters handling her unrelated third-party claim against Dr. Ellis should have recognized that Plaintiff had a claim for first party PIP benefits and arranged to open such a claim, such argument fails as a matter of law due to Plaintiff's lack of standing."  (Def.'s Mem. 17.)

The Court disagrees with Defendant's characterization of Plaintiff's bad faith claim and

its argument with regard to standing. Plaintiff has not alleged that Defendant acted in bad faith in handling her claim against Dr. Ellis, which is covered by the general policy. Rather, she is claiming that Defendant failed in its duty to promptly investigate whether she had her own source of First Party Benefits and, upon learning that she did not, inform her that she could file a claim with Defendant for medical and wage loss benefits. Notably, Plaintiff ascribes this duty to Defendant as an entity, not to any particular department or claims adjuster. Therefore, the fact that the Bodily Injury Department may not have had a responsibility to Plaintiff as an insured is not a complete defense to Plaintiff's claim. Furthermore, the record shows that one of the bodily injury adjusters actually informed Defendant's PIP supervisor about the incident as early as December 29, 2008. (See Claim Report at FFIC 00091.) Defendant has not challenged Plaintiff's standing to raise a bad faith claim based upon the acts or omissions of the PIP supervisor or any other employee who handles First Party Benefits. Accordingly, the Court declines to grant summary judgment on the grounds that Plaintiff lacks standing to bring a claim for bad faith.

Turning to the merits of the bad faith claim, Defendant argues that Plaintiff has not identified any act that could be considered dishonest; rather, she merely complains about the length of time it took Defendant to recognize that she might be entitled to First Party Benefits. (Def.'s Mem. 18.) Defendant also notes that Plaintiff herself never raised the issue of potential PIP benefits—it was only through a phone call with one of Plaintiff's medical providers that Defendant learned she lacked a separate source of coverage. (Id.) As such, Defendant argues that to the extent there was a delay in identifying Plaintiff's entitlement to certain benefits, it was attributable to both Defendant and Plaintiff, and periods of delay for which both parties are

9

responsible do not give rise to a claim for bad faith.  (Id. at 18-19 (citing Quaciari v. Allstate Ins. Co., 998 F. Supp. 578, 583 (E.D. Pa. 1998).)

        In response, Plaintiff argues that bad faith is inherent in the fact that Defendant, without providing a reason or an excuse, delayed for over a year in assessing the status of her insurance coverage.  (Pl.'s Resp. Opp'n 20-28.)  In support of this position, she notes that Defendant's own claims manuals require employees to conduct a thorough investigation of all possible coverage, and that Defendant's Claims Director, James Turano, admitted that Defendant was in the best position to accurately determine the benefits available under its policy.  (Id. at 21-22.)

        Plaintiff also relies heavily on the Western District of Pennsylvania's decision in Wisinski v. American Commerce Group, Inc., No. Civ.A.07-346, 2011 WL 13744 (W.D. Pa. Jan. 4, 2011).  (Pl.'s Resp. Opp'n 17-19.)  There, the court found that an insurance company acted in bad faith by failing to inform its insured of the correct amount of her policy limit, despite the fact that it had the necessary information in its possession and at least six different employees worked on the claim.  Wisinski, 2011 WL 13744, at *13.  In so holding, the Court stated in relevant part:

> While there is no direct evidence that [the defendant] intentionally did not inform [the plaintiff] of the correct policy limit, an insurance company is in the best position to accurately determine the correct policy limit of its own policy.  Thus an insurance company that possesses the information to allow them to accurately determine the policy limit but fails to inform the insured of the correct policy limit does so either intentionally or recklessly.

Id.  Plaintiff suggests that Defendant's failure to investigate her eligibility for First Party Benefits is tantamount to the conduct of the defendant in Wisinski.  (Pl.'s Resp. Opp'n 20-21.)

        After a thorough review of the evidence submitted, the Court concludes that a question of

fact remains concerning whether or not Defendant's failure to promptly investigate Plaintiff's eligibility for First Party Benefits was done in bad faith. The record shows that the Bodily Injury Department opened Plaintiff's file on December 24, 2008. (Claim Report at FFIC 00092.) A bodily injury claims adjuster, Joni Dalton, discussed the case with a PIP supervisor on December 29, 2008. (Id. at FFIC 00091.)[3] That same day, Ms. Dalton attempted to contact Plaintiff, but was told to talk to Plaintiff's then attorney, Steven Rubin. (Id. at FFIC 00091.) Ms. Dalton called Mr. Rubin on December 29 and 30; both times, she received no response and left a message requesting a return phone call and a letter of representation. (Id.) There is no evidence that Mr. Rubin returned the initial phone calls, and Ms. Dalton called again on March 24, 2009. (Id. at FFIC 00090.) Again, Mr. Rubin was unavailable, but Ms. Dalton spoke to a woman named Mary, who confirmed that Mr. Rubin represented Plaintiff, provided details about Plaintiff's injuries, and agreed to fax over a letter of representation. (Id.)

Over the next few months, Defendant communicated on multiple occasions with Plaintiff's medical providers regarding Plaintiff's claim. (Id. at FFIC 00089.) According to the claim history report, no one—Plaintiff nor Defendant—made any substantive inquiry into whether Plaintiff had PIP coverage until February 9, 2010, when Mr. Rubin asked if Defendant's policy provided his client with any wage loss coverage. (Id. at FFIC 00087.) Felix Villarreal, who worked in the Bodily Injury Department, then spoke to representatives in the PIP Department, who informed him that Plaintiff needed "to make [a] wage loss claim with her own

---

[3] Ms. Dalton's file notes state as follows: "Venue-PA-Modified comparative state 51% bars recovery. Discussed with Pip supervisor. It follows the person rather than the vehicle in this state. Clmt will need to file with her own carrier, unless she has no auto coverage. No subro in this state. SOL 2 yrs for bi. No pip needs to be set up if clmt has coverage." (Id. at FFIC 00091.)

personal auto policy . . . and then if there is no coverage there, we would be secondary." (Id.)
Mr. Villarreal then called Mr. Rubin back and told him to contact Julie Franklin in Defendant's
PIP Department. (Id. at FFIC 00086-87.) When Defendant confirmed that Plaintiff did not have
her own PIP coverage, it opened a "PIP suffix" for her claim. (Id. at FFIC 00086.)

Like Wisinski, there is no direct evidence of bad faith in this case. Indeed, the Court
finds it curious that Plaintiff apparently did not depose or submit interrogatories to the employees
who would have had first-hand knowledge about the reasons for the delay. For example, the
Court is unable to locate any statement from Ms. Dalton or any of the other bodily injury claims
adjusters who worked on Plaintiff's case prior to February 2010. Likewise, there is no testimony
from the PIP supervisor with whom Ms. Dalton discussed Plaintiff's claim in December 2008.
The Court also lacks any information pertaining to Defendant's communications with Mr. Rubin,
Plaintiff's prior attorney, about the nature of the claim his client was making and whether they
had any discussions about potential forms of coverage.

Nevertheless, Plaintiff *has* submitted evidence demonstrating that: (a) Defendant failed to
investigate whether she had PIP coverage, despite the fact that a PIP supervisor had been made
aware of Plaintiff's claim against Dr. Ellis and that the supervisor knew Defendant could
potentially be liable to her if she had no separate source of insurance; (b) Mr. Turano,
Defendant's claims director, admitted that Defendant was in the best position to determine policy
coverages and that its employees had a duty to investigate all forms of coverage;[4] and (c)
Defendant has not offered any explanation, let alone a reasonable one, as to why it failed to

---

[4] (See Pl.'s Resp. Opp'n, Ex. H, Dep. of James D. Turano, 23:9-24:6, 52:9-12, Mar. 15, 2012.)

12

undertake such an investigation.[5]  At the very least, a jury confronted with this evidence could

conclude that Defendant recklessly disregarded the fact that it had no reasonable basis for

delaying its inquiry into the types of insurance coverage to which Plaintiff was potentially

entitled.  See Ania v. Allstate Ins. Co., 161 F. Supp. 2d 424, 430 n.7 (E.D. Pa. 2001) ("A

reasonable delay alone will not establish a bad faith claim, . . . but delay can be grounds for

liability if an insurer knows of or recklessly disregards the lack of any reasonable basis for its

delay.") (citing Quaciari v. Allstate Ins. Co., 998 F. Supp. 578, 583 (E.D. Pa. 1998)).

Accordingly, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's claim

that the delayed investigation into her eligibility for First Party Benefits was an act of bad faith.

> **2.      Whether the Period of Time Between Defendant's Receipt of
> Plaintiff's Medical Reports and Payment of Wage Loss
> Benefits Constituted a Bad Faith Delay**

Defendant asserts that, in March 2011, it received a medical report from one of Plaintiff's

doctors indicating that she was able to work.  (Def.'s Mem. 19; Brott Decl. ¶¶ 17-18.)  Because

Defendant believed Plaintiff was not completely disabled, it issued a wage loss benefits payment

in June 2011 that covered only part of the time following the accident and Plaintiff's subsequent

surgeries.  (Def.'s Mem. 19; Brott Decl. ¶¶ 17-18.)  In August 2011, Plaintiff provided

supplemental documentation stating that she was completely unable to work at her previous,

sedentary occupation.  (Def.'s Mem. 19-20.)  In light of this new information, Defendant paid out

the full amount of the wage loss claim.  (Id.)  Defendant contends that this chronology of events

---

[5]  Defendant contends that the delay "might suggest negligence," (Def.'s Mem. 18), but
the Court is unable to find any section of Defendant's brief that actually explains why its
employees failed to inquire into whether Plaintiff had her own source of PIP coverage.  The
Court is therefore unable to determine whether the delay resulted from mere negligence or was an
intentional or reckless act made in bad faith.

demonstrates that it acted diligently in processing Plaintiff's claim, and so the length of time it took to completely ascertain Plaintiff's wage loss entitlement cannot be considered a bad faith delay.

After reviewing Plaintiff's opposition brief, the Court is unable to locate any substantive response to Defendant's argument. Rather, with respect to her claim of bad faith stemming from delay, Plaintiff focuses almost exclusively on the time it took Defendant to investigate whether she was entitled to PIP benefits, not on Defendant's conduct once it learned Plaintiff was making a wage loss claim. (See Pl.'s Resp. Opp'n 20-28.)[6] Furthermore, the documents submitted to the Court suggest that, to the extent there was any delay at all in Defendant's handling of the wage loss claim, it was due to Defendant's need for additional information regarding Plaintiff's ability to work. In such circumstances, delay is not indicative of bad faith. See Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 589 (E.D. Pa. 1999) ("if delay is attributable to the need to investigate further . . . no bad faith has occurred"). Therefore, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's claim that Defendant acted in bad faith in processing her wage loss claim.

### 3.    Whether Defendant's Deduction of Disability Benefits from Plaintiff's Wage Loss Check Constitutes Bad Faith

---

[6] The only reference to the processing of the wage loss claim that might suggest bad faith is Plaintiff's assertion that "[t]he first documentation for Fireman's Fund issuing Ms. Platt's wage loss payment was not until 9/15/11, approaching 3 years following the accident." (Pl.'s Resp. Opp'n 28.) The Court rejects this argument. As an initial matter, the record shows that the first wage loss payment was issued to Plaintiff on June 1, 2011, not September 15, 2011. (Def.'s Mot. Summ. J., Ex. B-10.) Plaintiff's refusal to cash the June 2011 check because she disagreed with the amount does not negate the fact that it was sent. More importantly, Defendant has demonstrated—and Plaintiff has not refuted—that the time it took to pay out the entire proceeds of the claim was due to Defendant's need for Plaintiff's doctors to verify that the accident rendered her unable to work.

14

Defendant also argues that it did not act in bad faith when it incorrectly deducted $3,716.66 in disability benefits from a wage loss check it sent to Plaintiff on June 1, 2011. (Def.'s Mem. 20-21.)  It is not clear to the Court why Defendant has raised this argument, however, because a claim for bad faith based on this alleged underpayment does not appear to have been alleged in the Complaint.  Indeed, the Complaint was filed on May 25, 2011, a week before the check was even sent.

On the other hand, the Court notes that an explanation of how the check was calculated was provided to Plaintiff's counsel on May 23, 2011.  (Brott Decl. ¶ 21.)  Therefore, in an abundance of caution—and because both parties treat this issue as a properly pleaded claim—the Court will generously assume that Plaintiff intended to include the erroneous calculation as a basis for its allegation that Defendant acted in bad faith "[b]y misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue."  (Compl. ¶ 38(f).)

Turning to the merits of the claim, Plaintiff contends that "evidence at trial" will demonstrate that Defendant should have been aware that Pennsylvania law prohibits the deduction of disability benefits from insurance payments.  (Pl.'s Resp. Opp'n 30 (citing Panichelli v. Liberty Mut. Ins. Grp., 669 A.2d 930 (Pa. 1996)).)  Plaintiff does not identify the evidence to which she is referring.  Furthermore, even if Defendant's calculation was improper, this fact in and of itself does not demonstrate bad faith.  Defendant contends that it merely made a mistake and has submitted documents demonstrating that it subsequently paid Plaintiff the full benefits owed to her under the policy.  Plaintiff has not introduced any evidence that contradicts this version of events or shows that Defendant knew or recklessly disregarded the fact that the deduction was impermissible.  See Crawford v. Allstate Ins. Co., No. Civ.A.07-3758, 2009 WL

15

2778796, at *3 (E.D. Pa. Aug. 31, 2009) (holding that a plaintiff alleging bad faith for denial of benefits must demonstrate that: "(1) the insurer did not have a reasonable basis for denying benefits under the applicable insurance policy; and (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim") (citing Terletsky v. Prudential Prop., 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).  Accordingly, summary judgment is also granted on the claim that Defendant acted in bad faith in calculating the wage loss payment.

###    B.    Breach of Contract

In Pennsylvania, a plaintiff alleging breach of contract must demonstrate "(1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages." Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 716 (Pa. Super. Ct. 2005) (citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc., 792 A.2d 1269 (Pa. Super. Ct. 2002)).  Significantly, a claim "'for breach of an insurance contract does not lie when the policy proceeds have been paid.'"  Enwereji v. State Farm Fire & Cas. Co., No. Civ.A.10-4967, 2011 WL 3240866, at *8 (E.D. Pa. July 28, 2011) (quoting Tangle v. State Farm Ins. Cos., No. Civ.A.08–112, 2010 WL 3420661, at *7 (W.D. Pa. Aug. 4, 2010)).

Here, Plaintiff claims Defendant breached the insurance contract by failing to pay her in accordance with the terms of the policy.  (Compl. ¶¶ 28-29, 31.)[7]  Defendant moves for summary judgment on the breach contract claim, arguing that it has paid Plaintiff the full policy limit of

---

[7]  Plaintiff also claims that Defendant breached the contract by failing to exercise good faith.  (Compl. ¶ 30.)  Pennsylvania law is clear, however, that "where the plaintiff alleges that the defendant breached its duty of good faith and fair dealing by denying first party benefits under an insurance policy, said claim is subsumed by the plaintiff's breach of insurance contract claim premised on the same conduct."  Simmons v. Nationwide Mut. Fire Ins. Co., 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011).  Accordingly, the Court grants summary judgment for Defendant on Plaintiff's claim that Defendant breached the insurance contract by acting in bad faith.

$177,500.  (Def.'s Mem. 13.)  Plaintiff has not responded to this argument and, because there is

no cause of action for breach of an insurance contract when the proceeds have been paid, the

Court grants Defendant's Motion for Summary Judgment on the breach of contract claim.[8]

### C.     Whether Plaintiff is Entitled to Attorney's Fees

Pursuant to Pennsylvania's Motor Vehicle Financial Responsibility Law, 75 Pa. C.S. §

1701 et seq. ("the MVFRL"), a plaintiff is entitled to reasonable attorney's fees when "an insurer

is found to have acted with no reasonable foundation in refusing to pay [first party] benefits[.]"

75 Pa. Cons. Stat. § 1798(b).  The attorney's fee, however, may not "be calculated, determined or

paid on a contingent fee basis, nor shall any attorney's fees be deducted from the benefits

enumerated in this subsection which are otherwise due such claimant."  Id. § 1798(a).

Here, Plaintiff alleges, without elaborating, that Defendant's conduct violated the

MVFRL.  (Compl. ¶ 33.)  Defendant contends that, to the extent Plaintiff claims that the benefits

she received were overdue and that she is entitled to interest under the MVFRL, she may not

recover attorney's fees.  (Def.'s Mem. 21-22.)  According to Defendant, Plaintiff and her counsel

entered into a prohibited contingency arrangement and, on several occasions, Plaintiff's attorney

improperly deducted his fee out of the proceeds paid to her.  (Id.)  In short, because Plaintiff

---

[8]  The Complaint also asserts that "Defendant insurer's actions were in reckless disregard
of Plaintiff's well-being and mental health."  (Compl. ¶ 43.)  This allegation comprises the
entirety of Plaintiff's claim for emotional distress.  It is not clear whether it is related to the
breach of contract or bad faith claim, but Defendant moves for summary judgment to the extent
Plaintiff argues it is related to the former cause of action.  (Def.'s Mem. 13-15.)  According to
Defendant, Plaintiff has failed to demonstrate that any emotional distress she experienced since
the accident was caused by Defendant's handling of her claim.  (Id.)  Plaintiff has not responded
to this argument.  Because Plaintiff has failed to identify with particularity what actions gave rise
to her claim of emotional distress, specify whether it stems from Defendant's alleged breach of
contract, or respond to any of the arguments in Defendant's brief, the Court grants Defendant's
Motion for Summary Judgment on the issue of emotional distress.

violated § 1798(a) of the MVFRL, she is not entitled to attorney's fees under § 1798(b).

The problem with Defendant's argument is that even though the MVFRL prohibits contingency fee agreements, nothing in the text of the statute states that an insured forfeits her right to recover attorney's fees as a penalty for entering into such an arrangement.  The Court's own research into this matter did not uncover any precedent in support of Defendant's position. While it is possible that a violation of § 1798(a) may give rise to some other kind of claim, Defendant has not proven that it categorically deprives a litigant of her ability to pursue attorney's fees.  Therefore, the Motion for Summary Judgment on the issue of attorney's fees is denied.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court finds that there is conflicting evidence as to whether Defendant knew or recklessly disregarded the fact that it had no reasonable basis to delay its investigation into Plaintiff's eligibility for First Party Benefits.  On the other hand, Plaintiff has failed to demonstrate that Defendant acted in bad faith in processing her wage loss claim once it learned that she was entitled to those benefits.  Accordingly, Defendant's Motion for Summary Judgment is denied to the extent that Plaintiff claims Defendant acted in bad faith by delaying its investigation, but is granted to the extent she claims Defendant acted in bad faith by delaying payment or deducting disability benefits from her wage loss payments.  Furthermore, Defendant has submitted evidence indicating it paid to Plaintiff the full limit of the First Party Benefits endorsement.  Because the law is clear that an insurance contract is not breached when all proceeds have been paid, Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim is also granted.  Finally, because Defendant has failed to establish that entering

into a contingency fee arrangement deprives a party from seeking attorney's fees under Pennsylvania's Motor Vehicle Financial Responsibility Law, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's request for such fees.